**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **FREDRICK HARMAN,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO.: |
| **CITY OF CANTON;** | ) |
| | ) |
| **JOHN D. GABBARD,** | ) |
| **CHIEF OF POLICE;** | ) JUDGE: |
| | ) |
| **CAPTAIN LES MARINO;** | ) |
| | ) |
| **CAPTAIN JOHN BOSLEY;** | ) **COMPLAINT** |
| | ) |
| **CAPTAIN LISA BROUCKER;** | ) **(Jury Demand Endorsed Hereon)** |
| | ) |
| **LIEUTENANT ANTHONY BIRONE;** | ) |
| | ) |
| **LIEUTENANT ERIC VANOVER;** | ) |
| | ) |
| **OFFICER CHRIS HESLOP,** | ) |
| **HEAD K9 TRAINER;** | ) |
| | ) |
| **NICHOLAS CASTO** | ) |
| **K9 TRAINER;** | ) |
| | ) |
| **OFFICER CURTIS GUTSCHER;** | ) |
| | ) |
| **OFFICER SPENCER ZERNECHEL;** | ) |
| | ) |
| **and OFFICER BRANDON** | ) |
| **MOMIROV,** | ) |
| | ) |
| Defendants. | |

Plaintiff Fredrick Harman ("Plaintiff"), by and through undersigned counsel, brings this

Complaint against Defendants City of Canton, Chief John D. Gabbard, Captain Les Marino, Captain

John Bosley, Captain Lisa Broucker, Lieutenant Eric Vanover, Lieutenant Anthony Birone, Officer

1

Chris Heslop, Officer Nicholas Casto, Officer Curtis Gutscher, Officer Spencer Zernechel, and Officer Brandon Momirov ("Defendants"), and makes the following allegations upon personal knowledge as to Plaintiff's own acts, upon information and belief, and Plaintiff's attorneys' investigation as to all other matters, and states as follows:

## I.     INTRODUCTION

1.     In the City of Canton, ordinary citizens are being victimized by police dog deployments that recall the grainy black and white film footage of the attacks on African Americans in Birmingham, Alabama, where police dogs were deployed as a tool of crowd control in the early 1960's.  Now nearly 60 years later, the City of Canton writes a new page in the history books, as it permits the unreasonable use of police dogs in bad faith and/or in a wanton or reckless manner to rip into the bodies of defenseless citizens during their arrests, when they are subdued, under control, and/or not a threat to anyone at the time they were apprehended.

2.     Plaintiff alleges that Defendant K9 Handler Casto identified below used excessive force when he deployed a police canine to bite, scratch, and tear into the flesh of Plaintiff without justification.

3.     Plaintiff further alleges, without limitation, that the Supervisory Defendants identified below knew or reasonably should have known of, participated in, endorsed, condoned, and/or ratified the unconstitutional conduct of their subordinate, Defendant Casto.

4.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for the deprivation of the Plaintiff's clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

5.     Plaintiff alleges, in light of Sixth Circuit case law, Defendant Casto and the other Defendants named herein acted contrary to clearly established constitutional law when he/they used

2

an inadequately trained and/or intentionally or wantonly mis-handled canine, often without warning, to apprehend suspects who were not fleeing nor posing a threat of physical harm to any person. *Ziolkowski v. City of Taylor*, No. 12-10395, 2013 WL 3872507, at *10 (E.D. Mich. July 24, 2013) ("It is well established that an attack by an unreasonably deployed police dog in the course of an arrest is a Fourth Amendment excessive force violation."), *citing*, *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 791 (6th Cir. 2012) (finding a jury could reasonably conclude the dog handler acted in bad faith or a wanton and reckless manner when handler let the police dog bite the suspect "as he lay on the ground with his hands out to his side.").

6.      Plaintiff also brings this action against Defendant City pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny.

## II.      JURISDICTION AND VENUE

7.      This Court has federal question subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought, pursuant to 42 U.S.C. § 1983, to redress a deprivation of constitutional rights as set forth herein.

8.      Venue is proper in this Court under 28 U.S.C. § 1391 because all incidents, events, and occurrences giving rise to this action occurred in the United States District Court for the Northern District of Ohio and, upon information and belief, all parties reside in this judicial district.

## III.   PARTIES

9.      At all times relevant to this action, Plaintiff Fredrick Harman ("Plaintiff Harman" or "Plaintiff") is/was a resident of the City of Canton, Stark County, Ohio.

10.      At all times relevant to this action, Plaintiff is a legal adult, being over the age of 18 years of age.

**City of Canton**

11.    At all times relevant to this action, Defendant City of Canton Defendant City of Canton ("Defendant City," and "Defendant Canton") is a municipal corporation located in Stark County, State of Ohio, who employed all police officer Defendants named herein as police officers, and has for its address 218 Cleveland Ave. SW, Canton, Ohio, 44702, in Stark County, Ohio.

12.    Defendant City maintains an active police force by and through its police department, which lists as one of its guiding principles: "To act with urgency to resolve conflicts in the community, applying common sense, fairness, and honesty in our service."

13.    At all times relevant to this action, all police officer Defendants identified herein are law enforcement officers employed by Defendant City of Canton, Ohio, and are residents of Stark, Summit, Portage, and/or Trumbull County, Ohio.

14.    The Directory of Public Safety and Chief of Police for Defendant City issue "Canton Police Department Rules and Regulations," to define the police purpose and the duties and conduct of all members of the Canton Police Department.

15.    The Canton Police Department Rules and Regulations are organized in a manual.

16.    According to the Foreword to the manual containing the Canton Police Department Rules and Regulations:

    a.    "Employees [of the City of Canton Police Department] are presumed to have knowledge of federal, state, and municipal ordinances in force, as well as the Rules and Regulations within this manual."

    b.    "It shall be the responsibility of all employees to become thoroughly familiar with the contents of this manual."

4

17. According to page 4 of the Canton Police Department Rules and Regulations:

   a. "The law enforcement officer shall assiduously apply himself[/herself] to the study of the principles of the laws which he[/she] is sworn to uphold."

   b. "The first duty of a law enforcement officer, as upholder of the law, is to know its bounds upon him[/her] in enforcing it."

   c. The law enforcement officer "will make certain of his[/her] responsibilities in the particulars of their enforcement, seeking aid from his[/her] superiors in matters of technicality or principle when these are not clear to him[/her]."

18. According to page 15 of the Canton Police Department Rules and Regulations:

   a. Supervisory officer is defined as, "Any member of the Police Department who attains the rank of Sergeant or above."

19. According to page 5 of the Canton Police Department Rules and Regulations:

   a. Defendant police officers "shall be mindful of [their] responsibilit[ies] to pay strict attention to the selection of means in discharging the duties of [their] office[s]."

   b. "Violations of law or disregard for public safety and property on the part of an officer are intrinsically wrong."

20. According to page 19 of the Canton Police Department Rules and Regulations:

   a. "The words 'shall' and 'will' as used herein shall indicate that the action required is mandatory."

21. According to page 5 of the Canton Police Department Rules and Regulations, Defendant police officers:

5

a. Will "so conduct [their] private [lives] that the public will regard [them] as an example of stability, fidelity, and morality."

b. Shall "deal with individuals of the community in a manner calculated to instill respect for its laws and its police service."

c. Shall "use powers of arrest strictly in accordance with the law and with due regard to the rights of the citizens concerned."

d. Shall "conduct [their] official [lives] in such a manner as will inspire confidence and trust."

e. Shall, "at all times, have a clear appreciation of his responsibilities and limitations regarding detention of [a law] violator."

f. Shall conduct themselves "in such a manner as will minimize the possibility of having to use force."

22.     Plaintiff alleges that at all times relevant to this matter, Defendants violated the aforesaid Canton Police Department Rules and Regulations.

**Head K9 Trainer Heslop**

23.     Defendant Head K9 Trainer Chris Heslop ("Defendant Head K9 Trainer Heslop") is a police officer employed by Defendant City of Canton, Ohio, is head trainer for Defendant City of Canton's K9 Unit, and is responsible for ensuring that all K9 Handler Defendants identified herein are adequately trained to properly perform their assigned duties.

**Officers Involved in K9 Deployment Against Plaintiff**

24.     The following Patrol Officers ("Patrol Officer Defendants") at the City of Canton are named as Defendants to this action and were involved in the arrest of Plaintiff Harman on April 24, 2024, as follows:

a. Defendant Officer Nicholas Casto ("Defendant K9 Handler Casto") is/was a police officer employed by Defendant City of Canton, Ohio, and a canine handler for the Canton Police Department (used excessive force).

b. Defendant Officer Curtis Gutscher is/was a police officer employed by Defendant City of Canton, Ohio, at the Canton Police Department (failed to intervene).

c. Defendant Officer Spencer Zernechel is/was a police officer employed by Defendant City of Canton, Ohio, at the Canton Police Department (failed to intervene).

d. Defendant Officer Brandon Momirov is/was a police officer employed by Defendant City of Canton, Ohio, at the Canton Police Department (used excessive force, and failed to intervene).

### Command Staff Involved in K9 Deployment Against Plaintiff

25.     At all times relevant to this action the following high-ranking members, or Command Staff, ("Command Staff Defendants") of the City of Canton Police Department are named Defendants to this action and were supervisors and/or top policy makers at the City of Canton regarding the arrest of Plaintiff, as follows:

a. Defendant Lieutenant Eric Vanover ("Defendant Shift Commander Vanover") is a police officer employed by Defendant City of Canton, Ohio (acting as direct supervisor of the Patrol Officer Defendants).

b. Defendant Lieutenant Anthony Birone ("Defendant Shift Commander Birone") is a police officer employed by Defendant City of Canton, Ohio (acting as direct supervisor of the Patrol Officer Defendants).

c. Defendant Captain Les Marino ("Defendant Captain Marino") is a police officer employed by Defendant City of Canton, Ohio, and the Uniform Patrol Division Captain of the Canton Police Department (oversees all Patrol Officer Defendants).

d. Defendant Captain John Bosley ("Defendant Captain Bosley") is a police officer employed by Defendant City of Canton, Ohio and the Commander of the Investigative Division of the Canton Police Department (oversees all Patrol Officer Defendants).

e. Defendant Captain Lisa Broucker ("Defendant Captain Broucker") is a police officer employed by Defendant City of Canton, Ohio and a Captain at the Canton Police Department (in the K9 Unit Chain of Command, supervises Defendant Head K9 Trainer Heslop, and is a supervisor for all incidents involving K9s).

f. Defendant Chief John D. Gabbard ("Defendant Chief Gabbard," and "Defendant Chief) is a police officer employed by Defendant City of Canton, Ohio, and the acting Chief of Police and top decision maker and policy maker at the City of Canton regarding the Canton Police Department and all employees thereof.

**Rules and Regulations Governing Canton Police**

26. Per the *Rules and Regulations of the Canton Police Department*, Defendant Shift Commander Vanover and Birone's duties include:

a. Acting as the Officer in Charge (OIC) of the daily departmental operations when the Chief of Police and Division Commanders are not on duty, *id*., pg. 42;

b. Coordinating the deployment and activities of patrol personnel, *id*.;

c. Being responsible for the conduct of roll calls, dissemination of information and/or materials, and inspection of officers for fitness for duty, *id*.;

d. Ensuring proper use of radio procedures by all members under his command, *id*.;

e. Advising and assisting subordinates in all phases of police work requiring his/her expertise, *id*.;

f. Ensuring proper processing of all complaints received by citizens, *id*.;

g. Examining for approval or disapproval all reports or records submitted by officers under his/her command, *id*.;

h. Briefing the on-coming Shift Supervisor on actions occurring during his shift;

i. Providing reviews and appraisals of the performance of subordinate supervisor, *id*. pg. 43;

j. Reporting any unusual occurrence, homicide, attempted homicide or other aggravated crimes to the Chief of Police immediately, *id.;*

k. Closely supervising the activities of his/her subordinates, *id*.;

l. Being expressly required to see that all complaints and requests for service anywhere in the City are promptly and properly investigated and that appropriate action is taken, *id*.; and

m. Counseling subordinate officers in the performance of their duties and shall take suitable action in the cases of any laxity, misconduct, incompetence, inefficiency or neglect of duty that may come to his attention. *Id*., pg. 43.

27. Per the *Rules and Regulations of the Canton Police Department*, Defendant Captain Marino's duties include:

9

a.  Being responsible for the constant maintenance of the Operational Patrol Plan, ensuring it reflects priority, emerging concerns as determined by shared intelligence, data, report evaluation, and all other factors designed to improve police response to the community, *id*. pg. 27;

b.  Ensuring the effective scheduling and deployment of officers on each shift in accordance with the Operational Patrol Plan, *id.*;

c.  Providing for regular audits of body-worn camera use in accordance with Department Policy, *id.* at 28; and

d.  Being responsible for the efficient, accurate completion of all reports generated by uniformed police officers and the submission of all report information as required by law. *Id*.

28.  Per the *Rules and Regulations of the Canton Police Department*, Defendant Captain Broucker's duties include:

a.  Being responsible for the operation of the administrative arm of the Police Department, *id*. pg. 26;

b.  Having specific responsibilities for all training programs, *id*.;

c.  Closely evaluating the performance and capabilities of all trainees and reporting their achievements and his/her recommendations to the Chief of Police, *id*.;

d.  Reviewing all departmental plans, including operational plans to see they are suitably up to date, *id*. pg. 27;

e.  Making adjustments when necessary to policy and procedure, *id*.;

f.  Being responsible for the proper and effective functioning of the Internal Affairs Office and their ability to investigate all reports from within or without regarding

10

personnel or policy problems of an internal or intra-departmental community nature, *id*.; and

g. Being responsible for background investigations of police candidates. *Id*., pg. 28.

29. Per the *Rules and Regulations of the Canton Police Department*, Defendant Chief Gabbard's duties include:

a. Reserving the right, as chief executive officer of the police department, to alter, amend, or rescind any departmental order or directive, *id*., pg. 2.

b. Having command, control, and supervisory authority over all members and employees of the entire Canton Police Department, *id*., pg. 18-19.

c. Being the Chief Executive Officer of the Police Department, *id*. pg. 24;

d. Having exclusive control of stationing and transfer of all supervisors, patrol officers and employees in the department, *id*.;

e. Organizing, directing and controlling resources of the Police Department, *id*.; and

f. Being responsible for the training of all members of the Department. *Id*.

**City of Canton Code of Ethics Governing Canton Police**

30. Defendant Canton's requires its police officers to abide by a Code of Ethics which is made of four numbered statements.

31. The first statement in Defendant Canton's Code of Ethics announces, "As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; protect the innocent against deception, the weak against oppression, and the peaceful against violence or disorder; and respect the Constitutional rights of all men to liberty, equality, and justice."

11

32.     Plaintiff asserts that, at all times relevant hereto, Defendants violated the City's Code of Ethics and thereby acted both inside and outside the course and scope of their employment as police officers for the City of Canton.

33.     Redress is being sought from all Defendants in their official and individual capacities, and it is further alleged that Defendants were acting under and/or outside of color of law and/or pursuant to the policies, customs and/or usages of the City of Canton.

34.     At all times relevant hereto, the Command Staff Defendants along with all Sergeant Defendants shall be referred to, from time to time, as "Supervisory Defendants" as set forth below.

## IV.  **FACTS**

35.     On or about April 24, 2024, Defendant K9 Handler Casto deploys an inadequately trained and/or intentionally or wantonly mis-handled canine against Plaintiff Fredrick Harman in an unreasonable and unconstitutional manner, thereby using or endorsing the use of excessive force upon Plaintiff Harman, to wit:

 a.  Defendant K9 Handler Casto is on scene, outside a home to arrest Fredrick Harman on an outstanding warrant.

 b.  Defendant Officer Momirov, Defendant Officer Gutscher, and Canton Patrol Officer Jonathan Versiackas are on scene as well.

 c.  After discussion with a female occupant of the home who is holding a baby and is also to be arrested, Defendant Momirov tells the woman that she is detained and continues into the house with her and the other Defendants to arrest Plaintiff Harman.

 d.  Defendant Momirov tells the woman to "put that kid somewhere" to which she responds, "I'm bringing him to his room".

e. Defendant Gutscher instructs the woman to let the child walk to his room, to which she responds, "no he can't, he's autistic, he's nonverbal".

f. Defendant Casto, states "Stop. You are under arrest, you're not making the decision, okay?"

g. Defendant Momirov tells Officer Versiackas to detain the woman.

h. The woman asks if the child can be put in his room, but Defendant Casto tells Officer Versiackas to take the child from the woman.

i. After the woman complains of being grabbed while the officers handcuff her, Defendant Casto says, "I'm going to get the dog."

j. Defendant Casto returns with his canine and the woman yells, "He isn't even doing anything!" and "He wasn't even resisting!"

k. Defendant Gutscher sees Plaintiff Harman in a back bedroom and orders him to keep his hands up and get on his knees.

l. Signaling he is compliant and has no weapons, Plaintiff Harman goes to his knees in front of a bed facing Defendant Momirov with his hands in the air, palms open, and that's when Defendant K9 Handler Casto releases the canine to attack Plaintiff Harman.

m. As the canine takes Plaintiff Harman to the ground and begins biting and ripping into his flesh, Defendant K9 Handler Casto picks Plaintiff Harman off the ground: at this point the canine has its mouth clamped around Plaintiff's forearm and throws its head back and forth while Plaintiff shouts in pain.

n. Defendant K9 Handler Casto, Defendant Momirov, and another officer throw Plaintiff Harman on the bed, chest down, with the canine still ripping into Plaintiff's arm.

o. The canine tears into Plaintiff Harman for nearly one full minute, i.e., 52 seconds.

p. Plaintiff Harman cries out in pain as he has one arm behind his back while the other is in the mouth of the canine.

q. Once Plaintiff Harman is handcuffed, Defendant K9 Handler Casto regains control of his canine, causing it to let go of Plaintiff's arm.

r. Defendant Momirov walks a now handcuffed Plaintiff out of the bedroom.

s. Defendant Momirov says "I think you know why we're here" to which Plaintiff Harman responds "No, I don't."

t. Plaintiff Harman is taken to the hospital for several lacerations and puncture wounds to his left arm as a result of the attack.

## V.  CLAIMS ALLEGED

### COUNT I
### (Excessive Force)

36. All preceding paragraphs are incorporated as if fully re-written herein.

37. This claim is brought pursuant to Title 42 U.S.C. § 1983.

38. Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

14

39.     The Fourth Amendment to the United States Constitution states, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."

40.     For decades, United States Supreme Court has interpreted the Fourth Amendment to the United States Constitution to prohibit a police officer's use of excessive force during the arrest of an unarmed, fleeing citizen. *See, e.g., Tennessee v. Garner*, 471 U.S. 1, 2 (1985).

41.     While acting under color of state law, Defendants deprived Plaintiff of his well-established right to be free from excessive force, per the authority cited herein.

42.     At all times relevant to this action, Plaintiff had the well-established constitutional right not to be subjected to excessive force while being arrested, even if his arrest could have been otherwise proper.

43.     In other words, Defendant K9 Handler Casto, along with the on-scene Patrol Officer Defendants for Plaintiff's arrest, and their respective Supervisors identified herein, was/were only permitted to use the amount of force necessary under the circumstances to arrest Plaintiff.

44.     At all times relevant to this matter, Defendant K9 Handler Casto along with all Defendants identified herein, were clothed with the authority of the state and misused that authority.

45.     In this case, Plaintiff claims Defendant K9 Handler Casto used excessive force when they deployed a poorly trained or wantonly mis-handled police canine during the arrest and/or bodily seizure of Plaintiff identified herein, as alleged above and below, to wit:

   a.   At the time Defendant K9 Handler Casto deploys his canine, Plaintiff Harman is subdued by multiple officers who have ordered him to his knees with his hands up, is unable to flee, is not a threat to any officer or person, is not fleeing, is not fighting, is not hiding is not resisting, possesses no weapon of any kind, makes

15

no verbal threats of any kind, is pinned down on a bed by Defendants, and behaves in a manner showing he is complying:  He voluntarily goes to his knees in front of a bed facing Defendant Momirov with his hands in the air, palms open – at which point Defendants allow the canine to attack him while they pin him to a bed and hold him down as the attack continues; furthermore, while he has fully surrendered to the authority of the on-scene Defendant officers, Defendant K9 Handler Casto does nothing to shorten the canine attack, stop the attack, or prevent it.

46.     As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff have been damaged, including but not limited to enduring pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

**COUNT II**
**(Failure to Intervene)**

47.     All preceding paragraphs are incorporated as if fully re-written herein.

48.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

49.     "A police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reasons to know that excessive force . . . was being used, and (2) the officer had both the opportunity and means to prevent the harm from occurring (citations omitted)." *Ontha v. Rutherford Cnty., Tennessee*, 222 Fed. Appx. 498, 506 (6th Cir. 2007).

50.     The Patrol Officer Defendants were on scene at Plaintiff's arrest and/or bodily seizure, and each observed excessive force being used upon Plaintiff, to wit:

a. The Patrol Officer Defendants witnessed an unarmed man in a bedroom complying with officer commands to raise his hands and get on his knees (he was

not fighting, fleeing, or  threatening harm to any person); and seeing the man do as he was told, they watched a police canine pounce on the kneeling man, biting, shaking, and tearing into his arm; and then they joined in the attack, pinning Plaintiff Harman to a bed and allowed the attack to continue for nearly a minute - instead of using the least amount of force necessary to effectuate an arrest or asking the Defendant K9 Handler to shorten, stop, or otherwise preventing the canine attack; furthermore, they allowed, watched, went along with, and/or made light of the canine attack without accurately reporting the unnecessary nature of the attack given the compliance of Plaintiff Harman immediately prior to the canine attack.

51.     The Patrol Officer Defendants had both the opportunity and means to prevent the harm from occurring to Plaintiff, to wit:

a.  The Patrol Officer Defendants were within speaking distance of Defendant Casto and had the ability to request the canine be called off;

b.  The Patrol Officer Defendants were in environments which afforded them the ability to see Plaintiff clearly, such that they could apprehend the fact that Plaintiff was unarmed, made no threatening gestures, and were compliant to officer commands before they were attacked by a canine – thereby putting them on notice that the use of a canine was not warranted before the canine was deployed.

c.  The Patrol Officer Defendants were in environments which afforded them the ability to hear Defendant Casto giving his canine commands, allowing them to realize when canine attacks were being prepared by Defendant K9 Casto, therefore allowing them to prevent the attack that Plaintiff endured; and their

17

ability to hear also revealed to them the fact that Plaintiff made any verbal threats to any officer.

d. The Patrol Officer Defendants had multiple opportunities to speak with the Defendant Casto in real time, and there were no exigent circumstances that made communication impossible or impracticable, therefore allowing them to coordinate their efforts to arrest Plaintiff without deploying a canine; yet, they refused that option in favor of an unplanned, haphazard approach of arresting Plaintiff – an approach they knew from experience would decrease their ability to prevent canine attacks.

e. The Patrol Officer Defendants were equipped with tools less harmful to Plaintiff than canines, such as pepper spray or tasers, but they chose to avoid those tools in favor of allowing a police canine to bite and tear into the flesh of Plaintiff.

52. With respect to the factual circumstances of Plaintiff's apprehension and dog attack, the incident lasted well beyond a matter of seconds, and Plaintiff was not arrested in a sequence of events which afforded no time to intervene, to wit:

a. The Patrol Officer Defendants had been on scene with Defendant K9 Handler Casto for not less than 10 minutes before the canine was deployed, and immediately before it was deployed, they said nothing when they heard Defendant K9 Handler Casto say "I'm going to get the dog," and even though Plaintiff Harman knelt on a bedroom floor with his hands in the air and palms open, the Patrol Officer Defendants had enough time to step back and clear a path for the canine to rush toward Plaintiff Harman and begin attacking him – they

also had enough time and attention to pick up Plaintiff Harman and pin him on to a bed as the canine continued his attack.

53.     Plaintiff therefore avers that the Patrol Officer Defendants had time with respect to the arrest of Plaintiff to perceive and intervene on behalf of an unarmed man who they knew or reasonably should have known was about to be attacked by a police K9, while unarmed, compliant, and non-threatening.

54.     As a direct and proximate result of the Patrol Officer Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to undergoing medical care and/or enduring intense pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## COUNT III
### (Supervisory Liability)

55.     All preceding paragraphs are incorporated as if fully re-written herein.

56.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

57.     "In addition to actively participating in the use of excessive force, an officer may also be liable if he supervised the officer who used excessive force or owed the victim a duty of protection against the use of excessive force (quotes omitted)." *Casey v. Sanders*, No. 7:17-CV-145-KKC, 2018 WL 3078758, at *5 (E.D. Ky. June 21, 2018); *citing Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *and Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996)).

58.     For the purposes of this Count, the Supervisory Defendants referred to herein include the Command Staff Defendants.

59.     The Supervisory Defendants have supervisory authority over the Canton Police Department, the Patrol Officer Defendants and/or Defendant K9 Handler Casto.

60.     At all times relevant to this action, the Supervisory Defendants knew or reasonably should have known of, and/or participated in, and/or condoned, and/or ratified:

   a.   Defendant K9 Handler Casto's attack upon Plaintiff at a point when Plaintiff posed no risk of harm to any officer or civilian immediately before the canine was deployed;

   b.   Defendants K9 Handler Casto's attack upon Plaintiff when all officers had a clear line of sight and clear picture that Plaintiff was unarmed, subdued, compliant, and/or non-threatening;

   c.   The Patrol Officer Defendants' use(s) of force upon an arrestee who was unarmed, subdued, compliant, and/or non-threatening while simultaneously being attacked by a canine; and

   d.   Defendant K9 Handler Casto's and the Patrol Officer Defendants' misrepresentations in their departmental reports about Plaintiff, which were designed to cover-up and otherwise ignore the canine attack that was directed against Plaintiff at a point when Plaintiff was unarmed, subdued, compliant, and/or non-threatening.

61.     The Supervisory Defendants knew or reasonably should have known that their acts and/or failures to act would likely cause and/or facilitate the constitutional injury that befell Plaintiff, to wit: by endorsing, promoting, encouraging, and/or not truthfully recounting Defendant K9 Handler Casto's actions, and/or by keeping the Defendant K9 Handler Casto employed at the City, and/or by  allowing him to continue to use his canine as a tool of force compliance under the circumstances detailed in this Complaint, Plaintiff endured bites and lacerations from the canine

20

attack due to Defendant K9 Handler Casto's reckless, wanton, and/or willful actions which were endorsed, condoned, and/or ratified by the Supervisory Defendants.

62.     The Supervisory Defendants had a duty and/or were required by his/their training to take action to discipline and/or otherwise prevent Defendant K9 Handler Casto and/or the other on-scene Patrol Officer Defendants from engaging in their above-stated conduct.

63.     Despite his/their direct knowledge and/or involvement in Defendant K9 Handler Casto's misconduct, as stated above, the Supervisory Defendants took no action, failed to impose reasonable discipline, failed to follow chain of command, failed to truthfully document the instances of misconduct, and/or otherwise abandoned his/their supervisory duties.

64.     As a result of his/their failures and/or abandonment of his/their supervisory duties, as stated above, the Supervisory Defendants created an environment that condoned the aforementioned misconduct and perpetuated and/or facilitated and/or aided Defendant K9 Handler Casto in the unreasonably violent and grotesque seizure of Plaintiff's person at a point when Plaintiff posed no threat to any Defendant or person at the time he was attacked by a police canine.

65.     The Supervisory Defendants engaged in acts and omissions that were the product of a reckless or callous indifference to Plaintiff's constitutional rights, to wit:

  a.  The Supervisory Defendants were present on scene and witnessed, trained, endorsed, and/or condoned Defendant K9 Handler Casto's use of police canines to attack Plaintiff in the manner detailed above, i.e., when Plaintiff had no weapon, was subdued, and/or posed no direct threat to them or the life of another;

  b.  Because they spoke to and/or witnessed Defendant K9 Handler Casto's deployment of his canine, the Supervisory Defendants knew or had reason to know that Defendant K9 Handler Casto wrote and/or spoke false narratives of his rationale for deploying

21

a police canine when they reviewed and/or signed-off on official police documents and reports, and they allowed these false reports to propagate in order to create an artificial narrative of the events to protect themselves, their fellow officers, and/or the City of Canton from civil and/or criminal liability; and

c. Despite having the aforesaid knowledge, the Supervisory Defendants continue to condone the conduct and actions of Defendant K9 Handler Casto.

66.     By their acts and failures to act as stated above, the Supervisory Defendants in fact caused Plaintiff's constitutional deprivation, to wit:

a. The Supervisory Defendants actively participated in the arrest of Plaintiff, and/or watched the deployment of the canine against Plaintiff and did nothing to address, prevent, or correct said deployments, and they communicated about the canine deployments within and outside the police department, such that Plaintiff was seized/attacked with extreme pain, tearing of flesh, and terrifying force while subdued, compliant, unarmed, and surrounded by Patrol Officer Defendants who also took no action and rendered no aid to prevent the attacks – thereby allowing the attacks to go forward - in violation of the 4th and 14th Amendments to the United States Constitution.

67.     As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to enduring pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## COUNT III
### (Municipal Liability pursuant to *Monell*)

68.     All preceding paragraphs are incorporated as if fully re-written herein.

69.     This claim is brought pursuant to Title 42 U.S.C. § 1983.

70.     Plaintiff alleges that at all times relevant to this matter, Defendant Head K9 Trainer Heslop failed to adequately train Defendant K9 Handler Casto regarding the constitutional limitations of the use of a canine, including but not limited to: what considerations must be made before deploying a canine to bite, when a bite is excessive force, when an on-going canine encounter or bite becomes excessive force, thus demonstrating the City's deliberate indifference to the rights of persons with whom the police come into contact.

71.     Plaintiff alleges that at all times relevant to this matter, Defendant City of Canton failed to provide proper department-wide training regarding, including but not limited to:

a.   Proper K9 training of the canines themselves, proper certifications of K9 Handers, proper training of K9 Handlers;

b.   Proper discipline for K9 Handlers who mis-treat their canines or use their canines to injure or frighten other citizens when off duty;

c.   Proper K9 Unit safety training regarding the considerations to be taken into count when working with the K9 Unit, deploying canines, and/or utilizing K9 teams - including examples of situations when canine teams would be useful (or would not be useful), and how to assist a canine team when in pursuit or searching for a subject, i.e., how, when, and how often to warn subjects about canine deployments before deploying a canine against them;

d.   Proper training for sergeants and other supervisors so they will understand when they should and should not call the canine team to an incident; and

e.   The capabilities of the canine team once it is on-scene.

72.     Plaintiff alleges Defendant City of Canton failed to require best practices be utilized regarding canine deployments.

73.     Plaintiff alleges Defendant City of Canton failed to provide written, clear policies and procedures explaining canine operations in practical, detailed, plain language to assist officers on the proper use of force with canines, including what should be considered before deploying a canine, to prevent exposing citizens, including Plaintiff, from undergoing excessive force during police encounters, thus demonstrating the City's deliberate indifference to the rights of persons with whom the police come into contact.

74.     Plaintiff alleges Defendant City of Canton provides no training or guidance to officers on the proper use of warnings prior to a canine deployment, giving the subject an opportunity to surrender; nor does the city provide training or guidance that warnings must be issued and suspects must have the opportunity to surrender before a canine is deployed, thus demonstrating the City's deliberate indifference to the rights of persons with whom the police come into contact.

75.     Plaintiff alleges the aforesaid failure to train thus demonstrates the City's deliberate indifference to the rights of people with whom the police come into contact.

76.     Defendant Police Chief Gabbard and the Supervisory Defendants is/are the top policymakers for the City of Canton Police Department.

77.     Defendant City of Canton maintains an armed police force, the Canton Police Department, with the power to arrest citizens.

78.     Defendant City of Canton is aware that its officers engage in violent, unreasonable behavior that involves excessive force in violation of the Fourth Amendment which involves the deployment of police canines, to wit:

a. The excessively forceful and violent arrest of Austin Elson on April 30, 2023, an unarmed male who was tackled to the ground, complied with officer commands, voluntarily put his hands in the air, palms open, and then – and only then – was attacked by a canine under the control of a Canton Police K9 Handler;

b. The excessively forceful and violent arrest of Kievin Conver on May 30, 2024, an unarmed black male who was tackled to the ground, complied with officer commands, voluntarily put his hands behind his back, and then – and only then – was attacked by a canine under the control of Defendant K9 Handler Casto; and

c. The excessively forceful and violent and lethal arrest of Plaintiff Harman on April 24, 2024, an unarmed male who knelt on the ground, complied with officer commands, voluntarily put his hands in the air, palms open, while kneeling and then – and only then – was attacked by a canine under the control of Defendant K9 Handler Casto;

79. Defendant City of Canton and the Supervisory Defendants have a long-standing and unwritten policy or custom of shielding officers from consequences for their use of excessive force and/or ignoring the use of excessive force on citizens during arrests, to wit:

a. Defendant City is known to tolerate and continue the employment of police officers who subject individuals to excessive force from canine attacks during arrests;

b. Defendant City accepts excessive force as a condition of police work at the City of Canton, to the extent that officers are trained and/or aided and/or otherwise allowed to avoid prosecution for their violent choices during the deployment of police canines by re-phrasing and artfully summarizing their violent actions and encounters with citizens in official police documentation;

c. For years, the Defendant City has acquiesced to a culture of violence in the Canton Police Department by abandoning its duty under the Charter of the City of Canton to exercise control over the Police Department and by avoiding to study or audit police deployments of police canines and the violent consequences of those deployments within the City of Canton;

d. For years prior to the canine attack on Plaintiff as detailed herein, Defendant City has fostered and condoned a culture of violence in the Canton Police Department by failing to remove police officers and/or exercise control over city employees who restrict and/or interfere with and/or hamper the oversight activities of the Defendant Chief; and/or

e. For years prior to the canine attack on Plaintiff as detailed herein,, Defendant City has perpetuated a culture of violence in the Canton Police Department by permitting officers who have engaged in excessive force or unreasonable violence toward citizens with canines to avoid the consequences of discipline or criminal investigation by failing to review body worn camera video, failing to correct police reports, and by not imposing meaningful consequences, such as termination or prosecution of police officers who engage in the violent and unreasonable deployment of police canines.

80. The unwritten policy and/or custom stated in the immediately preceding paragraphs is/are known to the Defendant Chief and Supervisory Defendants, who approved, benefitted from, ratified, encouraged, sanctioned, and/or promoted this policy or custom throughout the Canton Police Department.

81. Following the canine attack on Plaintiff as detailed herein, the Supervisory Defendants and Defendant Chief continue to approve, ratify, encourage, sanction, and/or promote the policy or custom of ignoring excessive force and fostering a culture of violence as they expressed

26

support for Defendant K9 Handler Casto and other K9 Handlers' actions, imposed no timely discipline on Defendant K9 Handler Casto, and have changed none of the training at Defendant City Canton regarding the use and/or deployment of canines with the City of Canton.

82.     By virtue of the public reporting on the subject of canine deployments, Defendant City and Defendant Chief have been exposed to that reporting and therefore have knowledge of the canine deployments against Plaintiff and their contribution to / promotion of the culture of violence within the City of Canton's Police Department.

83.     To date, Defendant City has never initiated any meaningful disciplinary proceedings against Defendant K9 Handler Casto, nor has it undertaken meaningful policy reviews or culture reforms since the attack on Plaintiff occurred and/or since the widespread media coverage of the canine attack on Kievin Conver, a case that garnered intense media attention throughout Northeast Ohio.

84.     To date, Defendant City does not maintain a proper department-wide written policy on the use, deployment, and constitutional limitations of canine deployments, bites, and tactics.

85.     The aforesaid unwritten policies or customs and absence of a proper written policy put Plaintiff, and the general public at unreasonable risk of grievous bodily harm, injury, or death.

86.      The aforesaid unwritten policies or customs as shown by the pattern of unreasonably violent cases listed above and reinforced by the lack of a proper written policy or meaningful discipline following a history of unreasonably violent police canine deployments did in fact cause/foster the attack on Plaintiff.

87.     At all times relevant hereto, the Defendant Chief Gabbard and the Supervisory Defendants initiated, authorized, condoned, ratified, and/or encouraged the aforesaid unwritten policies or customs.

88.     Defendant Chief Gabbard and the Supervisory Defendants had knowledge of the aforesaid unwritten policies or customs because they worked at the City of Canton at the time the aforesaid policies or customs were in place and communicated about canine attacks on citizens.

89.     The Supervisory Defendants reviewed documents, discussed, and/or received details and information at the Canton Police Department about the manner in which Defendant K9 Handler Casto deployed and/or continued the vicious deployment of a police canine against Plaintiff while they were unarmed, subdued, and compliant.

90.     By their actions and failures to act as aforesaid, Defendant Chief Gabbard and the Supervisory Defendants approved of Defendant K9 Handlers Casto's conduct and choices.

91.      Defendant Chief Gabbard and the Supervisory Defendants were thus on actual and/or constructive notice of these unwritten, department-wide policies, practices or customs but did nothing about them.

92.     Upon information and belief, Defendant City of Canton, by and through its Head K9 Handler and/or the Supervisory Defendants, does not train its police force on the proper use and/or constitutional limits of canine deployments, to wit:

a.     No rules or training provide that a mandatory warning be given to a suspect prior to the deployment of the canine.

b.     No rules or training provide that canine bites/attacks must not be initiated and are excessive force when a subject is unarmed, subdued, compliant, and not a threat to any person.

c.     No rules or training provide City-wide minimum standards for the deployment of canines within the City of Canton Police Department.

d.      No model departmental policies or best practices have been offered by Defendant City to address or correct the aforementioned constitutional problems caused by the deployment of canines, despite the existence of those policies within the police profession.

e.      In fact, Defendant City of Canton is one of the Ohio cities that has never maintained current best-practices regarding the deployment of canines.

f.      Defendant City of Canton has one of the highest per capita incident rates of canine deployments in the State of Ohio cities, and still, it has failed to promulgate or implement best practices regarding the deployment of canines.

93.     Upon information and belief, Defendant City of Canton does not train officers, such as Defendant K9 Handler Casto, to de-escalate citizen encounters where people, like Plaintiff, run from, yell at, or attempt to hide from officers on foot while unarmed.

94.     Upon information and belief, Defendant City of Canton does not discipline officers, such as Defendant K9 Handler Casto, who deploy their canines on subdued, compliant, unarmed persons, like Plaintiff.

95.     Upon information and belief, Defendant City of Canton does not discipline officers, such as Defendant Casto, who fail to deescalate situations where people run or try to hide from officers on foot while unarmed.

96.     The need for said training and discipline, as aforesaid, is so obvious that the failure of Defendants to conduct said training and discipline establishes Defendants' objective deliberate indifference to the constitutional rights of Plaintiff and all who live in the City of Canton.

97.     As a direct and proximate result of Defendants' actions, as set forth above, Plaintiff has been damaged, including but not limited to, being mauled by police canines who ripped, tore,

and punctured his flesh, endured pain, anguish, embarrassment, humiliation, feelings of powerlessness, harm to self-esteem, emotional distress, fear, anxiety, loss of sense of personal safety, dignity, and legal fees and costs.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for not less than $6,000,000.00, including but not limited to:

A.      Compensatory and consequential damages in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

B.      Punitive damages in an amount to be determined at trial, for the willful, reckless, and malicious conduct of Defendants;

C.      Equitable relief, including, without limitation, that Defendant City of Canton be made to adopt an appropriate policy to prevent future instances of the type of misconduct described herein;

D.      Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E.      Any and all other relief that this Court deems equitable, just and proper.


## VII.  **JURY DEMAND**

Plaintiff respectfully demands a trial by jury of the within matter.

Respectfully submitted,

*/s/ Kenneth P. Abbarno*
Kenneth P. Abbarno (0059791)
Robert F. DiCello (0072020)
Justin J. Hawal (0092294)
Peter C. Soldato (0099356)
Joseph T. Frate (0101377)
Jordyn A. Parks (00102573)
**DiCELLO LEVITT LLP**

30

8160 Norton Parkway, Third Floor
Mentor, Ohio 44060
Tel.: 440-953-8888
kabbarno@dicellolevitt.com
rfdicello@dicellolevitt.com
jhawal@dicellolevitt.com
psoldato@dicellolevitt.com
jfrate@dicellolevitt.com
jparks@dicellolevitt.com

***Counsel for Plaintiff***